LOTTINGER, Judge.
This is suit sounding in tort by Whitney Maturin for physical injuries sustained by his minor son, Raywood Maturin. The defendant is American Motorists Insurance Company, the liability insurer ofthe Iberia Parish School Board. The Lower Court awarded judgment in favor of defendant and dismissed the petitioner’s suit. The petitioner has taken this appeal.
This suit arises from an accident between an automobile driven by young Maturin and a school bus driven by Aaron O. Bas- *85 tian. The accident occurred approximately three miles east of New Iberia on U. S. Highway 90, which is a heavily traveled thoroughfare running generally east and west. The said highway is blacktopped for a width of 24 feet, and the north shoulder in the vicinity of the accident had a width of some 8 to 9 feet. The accident occurred at approximately 7:45 to 8:00 A.M. on the morning of November 12, 1956, at which time the weather was dry and clear.
Immediately prior to the accident, young Maturin was traveling in a westerly direction along U. S. 90 in his father’s 1956 Model Ford Sedan. He was carrying one passenger, namely Kossuth Boutte, who was seated on the right front seat. The two boys had just gotten off of work at 6:30 that morning, and were going to their homes situated in New Iberia. The bus, driven by Aaron Bastían, was proceeding in an easterly direction, picking up school children, and, was about to make a left-hand turn into the Frilot driveway, to turn around and make the return trip to the New Iberia school. It was a custom of the driver of the school bus to make his daily turn in the driveway of the Frilot residence in which he picked up certain school children. The Frilot residence was situated at the eastern extremity of his route.
The petitioner claims that his minor son, Raywood, was traveling at a speed of approximately 55 miles per hour immediately prior to the accident. This fact was testified to by both Raywood and his passenger, Kossuth Boutte. Raywood testified that, though his speedometer was broken, he figured that to have been his speed. Boutte testified that he guessed the speed of the Maturin vehicle to have been some 55 to •60 miles per hour. Petitioner contends that •as his son approached the Frilot residence, the bus suddenly, and without warning executed a left turn immediately in front of young Maturin. Young Maturin immediately applied his brakes, and struck the bus between the front fender and the right door while the bus was still crossways, of the highway, according to the evidence of petitioner. Young Maturin had given statements prior to trial of the matter which conflicted with his testimony in several important respects. According to these prior statements, he knew nothing whatsoever of the accident, and did not even know that he had hit a bus until he was informed thereof subsequent to his regaining consciousness after the accident. One of these statements was made only 12 days after the accident, while the other statement was made on February 2, 1957, which was some 3 months after the accident. He justifies these statements by saying that he did not remember anything about the accident until approximately a year thereafter, and that even at the trial of the matter he was still remembering things which he had not remembered before.
Upon trial young Maturin testified that he first saw the bus when it was at least 2,000 feet down the highway. He never did see any flags, signs or turn signals indicating that the bus driver was intending to execute a left turn, and he claims that the bus, without coming to a stop, or without giving any signals whatsoever, turned in front of him when he was just a short distance away. It is interesting to note that young Maturin testified that he was riot wearing his glasses at the time of the accident because he could see better without his glasses than he could with them.
The defense, on the other hand, takes the position that shortly before the turn, the bus had stopped to pick up school children who were standing alongside the highway. After gathering its passengers, the bus started up again, proceeded about one city block, and then stopped, displayed the necessary turn signals, and then commenced his left turn into the Frilot driveway. When the bus was perpendicular to the highway, and in the Frilot driveway with only about 18 inches of the rear end of the bus protruding on the blacktop, it was struck violently by the Maturin car. The driver of the bus was thrown through the window, and the bus was knocked to a 90° angle from its original position into a ditch *86 paralleling the highway in front of the Frilot residence. The bus came to rest with its right wheels in the ditch, leaning toward the north, and, according to pictures introduced into evidence, the bus appears to have been thrown clear of the Frilot driveway. The point of impact to the bus was in the area between the right front wheel and the right door, while the point of impact to the car was the entire front end. The car came to rest facing north, in the Frilot driveway, and with its rear end being some 10 to 15 feet from the edge of the blacktop. As a result of the accident all windows which are shown on the right side of the school bus were broken.
Renees Falgout, the state police officer who investigated the accident, testified on behalf of petitioner. He stated that the time he arrived at the scene of the accident was about 8 :00 o’clock A.M., approximately 20 minutes after the impact. He testified that the vehicles were located approximately 10 to 15 feet apart, and that the bus was situated 7 to 8 feet from the blacktop. He measured the skid marks, which he assumed were made by the Ma-turin car, and the said marks were for a distance of 131 feet to the point of impact. He further testified that the left skid mark left the blacktop some 15 to 20 feet before the impact and that most of the debris, apparently caused by the collision, was scattered between a point 1 foot from the edge of the blacktop to a point located approximately 8 feet on the shoulder.
Petitioner introduced three witnesses who were riding in a station wagon which was following a car traveling immediately behind the school bus. These witnesses know little or nothing about the accident, because, at the time, they were looking to the rear of the station wagon at a cane truck which was following it. One of these witnesses, however, did testify that the bus did stop before making the turn, however he did not notice whether any flags or turn signals were displayed because of his looking to the rear.
Babara Ann Gray, the witness for defendant, testified that, at the time of the accident, she was walking along the north shoulder of the highway in a westerly direction, approaching the Frilot driveway. She suddenly heard a loud noise in back of her, turned around and saw a car approaching her mostly on the shoulder, with just its left wheels on the blacktop. She immediately jumped into the ditch so that the car would not hit her. As she was getting up from the ditch she heard a loud crash, and upon looking up saw the result of the impact. At the time Miss Gray jumped into the ditch she was 275 steps from the Frilot driveway, her steps measuring 2 feet each. She did not know whether the car regained its lane of traffic prior to the impact, as she was evidently too busy attempting toi get out of the way.
Perry Bourda, a first cousin to the driver of the school bus, testified, for defendant, that he was following the station wagon behind the bus. In other words, he was the third vehicle in line to the rear of the bus. He testified that the bus stopped, and two flags were extended from the left-hand windows thereof, and the turn lights were blinking on the bus, prior to the driver making a left turn. He did not notice whether the stop sign was displayed on the left-hand side of the bus. As the bus was completing its left turn, he saw the Maturin car coming at approximately four blocks away, and at a very high rate of speed. He testified that the car started leaving the highway when it was approximately two to two and one-half blocks away from the bus. When the bus was in the Frilot driveway, with about 18 inches extending over the blacktop, he heard the loud impact. At this time he was unable to see the car because the bus was blocking his view. He testified that he would say the car was traveling about 75 miles per hour.
Aaron O. Bastían, the bus driver, testified that he had picked up school children at a distance of about one block down the highway from the Frilot driveway. He tes *87 tified that he then proceeded about one block, came to a dead stop, and put out the stop sign, which protrudes from the left side of the bus. He testified that he assumed the turn lights were flashing, as they go on automatically whenever the brakes are applied, and the little signal light on the dashboard was blinking. He checked into his rearview mirror, situated on the left side of the bus, and saw that the two red flags were displayed by students. As he did not see anyone approaching from the front for a distance of some 400 feet, he commenced his left turn and was in the driveway, when, he noticed the car headed toward him on the shoulder of the road and at a distance of about one-half block away. Bastían testified that the rear end of the bus could not have been more than a foot to one and one-half feet protruding from the blacktop at the time of the impact. Upon noticing the impending crash he applied his brakes.
The evidence discloses that the bus was a usual school type bus with a length of some 26 to 28 feet. Upon stopping to pick up children, the approaching motorists are warned by blinking lights situated at the top of the body of the bus, as well as a sign bearing the word stop, which is swung out from the left side of the bus by the driver, together with two red flags which are held out the window by students, one in the front of the bus, and one in the rear of the bus.
Dr. Leon Slipakoff, an eye, ear, nose and throat specialist, testified on behalf of defendant. Dr. Slipakoff testified that young Maturin had defective vision, and that he had therefore advised him not to drive. This condition had existed since infancy. The doctor testified that, even without his glasses, however, young Matur-in could see a large object like a school bus, but probably could not see a small object at a distance.
It appears to us that prior to making the turn certain signals, consisting of two red flags, the stop sign, and, the flashing lights were displayed by the bus. The bus driver testified that he knows the stop sign and the two flags were displayed, one of the student passengers testified that he knows both flags were displayed, however, he did not look to see if the stop sign was displayed, and the cane trade driver testified that he saw the two flags and the blinking lights. We, therefore, have three witnesses who testified that at least some of the signals were displayed, and by combining their testimony it appears that all of the said signals were shown. The parties riding in the station wagon following the bus did not know whether any signals were displayed because they were not looking in that direction. The only witness who could contradict them is young Maturin himself, who testified that he did not notice any signals. Of course, this might very well be explained by his, defective eyesight, or by the fact that he was just not paying attention to what was happening in front of him.
It also appears that prior to the impact the Maturin vehide made skid marks for a distance of 131 -feet, which skid marks ran diagonally to the highway, and left the blacktop at a distance of some 15 to 20 feet before the point of impact. Considering the length of the skid marks, together with the great force of the impact, which is substantiated both by the pictures filed in evidence as well as the position of the respective vehides thereafter, it certainly appears to us that the Maturin vehide was traveling in excess of the 60 mile per hour lawful speed rate.
In his decision, the judge of the Lower Court referred to stopping distances as listed in a table contained in 14 Tulane Law Review at page 503. According to this table, a vehicle traveling 60 miles per hour would travel 88 feet per second, and, under excellent conditions, would require a net braking distance of 141 feet. The Lower Court, in considering the 131 foot skid marks, as well as the force of the impact, concluded that young Maturin was exceeding the 60 mile per. hour speed limit The *88 table in question was not filed into the evidence, and the defendant devotes almost his entire brief in taking issue of the Lower Court’s use of said table under the circumstances. Of course any table of this nature is to be used only as a guide. In using such table, question must be given to tire type of vehicle, its weight, the condition and type of the roadway, the condition of the brakes as well as the tires, as well as the individual driver of the vehicle. It appears to us that such considerations were given by the Lower Court. In reaching its conclusion, the Lower Court said:
“It is true that these calculations are only approximate and allow only a short period of time within which Maturin is charged with the duty of taking action. But driving present-day vehicles on our modern highways involves split-second timing. Although one second is a short interval of time, yet at 60 miles per hour a car travels 88 feet in that time. At 70 miles per hour the distance covered is 102.5 feet. When motorists choose to travel at an excessive speed they must be charged with the responsibility of keeping their vehicles under such control, and keeping a sharp lookout, so that they can bring their vehicles to a stop, in case of an emergency, within the limits that they would have been able to stop had they been traveling at a legal, or reasonable, speed. Their failure to do so constitutes negligence.
“Here, it is very apparent that Ma-turin took no' steps to' slow down or to stop his car during most of the 4 or 5 seconds that the bus was turning across his right of way. He was either oblivious to- danger, or was not looking ahead. Had he been driving at 60 miles per hour he would have been 352 feet away when the bus crossed into his lane, if the bus took 4 seconds to turn, and 440 feet away, if the bus took 5 seconds to make its turn. It is very evident, however, that he was traveling considerably faster than that. So, he was considerably farther away,, yet, he did not attempt to stop until he was a few feet more than 131 feet away. His failure to see the bus, when he should have seen it, and his failure-to apply his brakes when he should have-applied them, and his excessive speed, are all acts of negligence that directly-contributed to the accident. They constitute contributory negligence,* and bar him from recovery.”
Now the Courts have on many occasions used similar tables as an assistance in determining stopping distances or speeds of vehicles. These various charts can only be considered, however, as guides and certainly cannot be deemed scientifically accurate unless one knew exactly what conditions existed at the time the figures contained therein are compiled.
The Lower Court found firstly that the-driver of the school bus was negligent in executing his left turn in the fact of oncoming traffic. It secondly determined that young Maturin was guilty of contributory-negligence in two respects: First, by proceeding at an excessive rate of speed; and. Secondly, by not slowing his speed upon noticing that the school bus was either stopping or prepáring to make a left turn. As-to this second factor, although young Ma-turin testified that he did not notice the-signals, he must be held responsible for not seeing what he should have seen. The Lower Court reasoned that he would beheld to noticing these signals, and that by failure to slow his¡ speed he was oblivious-to the danger of the situation.
The evidence as a whole discloses that young Maturin was certainly guilty of contributory negligence. Even discounting-the use of the speed charts by the Lower-Court, the physical facts indicate to us that he was proceeding in a speed in excess-of 60 miles per hour. The facts further indicate that he was not keeping the proper lookout which is imposed upon him by law. We certainly find no error below.
*89 For the reasons hereinabove assigned the judgment of the Lower Court will be affirmed, and all cost of this appeal will be paid by petitioner.
Judgment affirmed.